**Elsie Viola MILLER and Oretta Bernice Lancaster, doing business as the Junction Cafe and Tavern, individually and as representatives of all others similarly situated, Plaintiffs-Appellants,**

v.

**OREGON LIQUOR CONTROL COMMISSION, Oregon Beer & Wine Distributors Assoc. Inc., their respective members, individually and as representatives of all others similarly situated, Spear Beverage Co., Coast Distributors, Inc., United Beer Dist., Co., James B. Beam Distilling Co., The Fleischman Distilling Company, Jack Daniel Distillery, Joseph E. Seagram & Sons, Inc., and Heublein, Inc., Defendants-Appellees.**

No. 80–3376.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 6, 1982.

Decided July 7, 1982.

As Amended on Denial of Rehearing
Sept. 27, 1982.

David W. Axelrod, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for plaintiffs-appellants.

Charles F. Hinkle, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., William F. Gary, Asst. Atty. Gen., Dept. of Justice, Salem, Or., for defendants-appellees.

Before BROWNING, Chief Judge, and WALLACE and BOOCHEVER, Circuit Judges.

WALLACE, Circuit Judge:

Miller and Lancaster, owners of a cafe and tavern (the tavern owners), brought this action against the Oregon State Liquor Commission (the commission), certain liquor wholesalers, and an association of liquor wholesalers (the wholesalers), contending that the pricing practices of Oregon beer and wine wholesalers, pursuant to adminis- trative rules promulgated and enforced by the commission, violate section 1 of the Sherman Act, 15 U.S.C. § 1. The commis- sion and the wholesalers moved to dismiss on the grounds that the antitrust claim was barred by the state action exemption and the twenty-first amendment. The district court granted the motion, holding that Ore- gon's involvement in regulation and control of the liquor industry was sufficient to es- tablish immunity from federal antitrust law under the state action exemption. We re- verse.

■ An order granting a motion to dis- miss is freely reviewable by us as a question of law. "[A] complaint should not be dis- missed unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Palmer v. Roosevelt Lake Log Owners Ass'n*, 651 F.2d 1289, 1294 (9th Cir. 1981), *quoting McLain v. Real Estate Bd.*, 444 U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980). We conclude that the dismissal of this action was a premature termination of the tavern owners' claim.

Oregon Administrative Rules 845–10–210 (Rule 210) and 845–06–090 (Rule 090)[1] reg-

---

1. Oregon Administrative Rule 845 10 210 (1980) provides, in part:
   *Price postings.*
   (1) Posting of malt beverage prices:
   (a) Licensees of the Commission engaged in the business of soliciting the sale of, selling or distributing malt beverages for resale within the State of Oregon shall file with the Commission at its Portland office a written schedule in three copies of prices to be charged for all such beverages offered for sale within the state. The prices shall be uniform for the same class trade buyers and shall set forth:
   (A) All brands and types of products of- fered for sale,
   (B) The delivered sale price for each size container to retail licensees,
   (C) Prices or maximum allowances or dis- counts to wholesale licensees, and
   (D) Any allowance granted for return con- tainers.
   All price postings shall be consistent as between the various packages and containers offered for sale. No price postings involving quantity discounts shall be made.
   (b) The Commission may reject any price posting which is in violation of any of its rules. . . .

(c) Unless rejected by the Commission, prices shall be effective on the tenth day following receipt of the posting at the Port- land office of the Commission. . . .
(d) All posting reflecting a price decrease, when accepted, shall remain in effect for 180 days after the effective date of the posting. The Commission, at its discretion, may waive the 180-day period to allow for price increas- es based upon conditions which in its opinion warrant the increases.
(2) Posting of wine prices:
(a) Licensees of the Commission engaged in the business of soliciting the sales of, sell- ing or distributing wine for resale within the State of Oregon shall file with the Commis- sion at its Portland office a written schedule in two copies of prices to be charged by such licensee for all wine offered for sale within the state. The prices shall be uniform for the same class of trade buyers and shall set forth:
(A) All brands, classes and kinds of wine offered for sale, and
(B) The delivered sale price of each size container to retail licensees.
Prices shall be the same for one container as for each like container in any quantity

ulate the pricing practices of wholesalers and thus affect the prices at which retailers can purchase beer and wine in Oregon. The tavern owners object to the following four features of the rules:

1. Quantity discounts are prohibited. Rule 210(1)(a) and (2)(a).

2. Licensees must post prices ten days prior to their effective dates. Rule 210(1)(c) and (2)(c).

3. Prices reflecting a price decrease generally must remain effective after posting for a period of 180 days for malt beverages and 30 days for wine. Rule 210(1)(d) and (2)(d).

4. Regardless of transportation arrangements, the prices must remain as posted, thus eliminating any transportation allowance. Rule 090.

The district judge did not consider whether these parts of Rules 210 and 090 violate the Sherman Act or whether the twenty-first amendment constitutes a defense. Instead, the district judge held that in adopting the regulations, the commission was acting for the state to establish, in part, a clearly articulated and affirmative policy of comprehensive liquor control.[2] Citing *Califor-*

*nia Retailer Liquor Dealer Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (*Midcal*), the district court held that this "policy is actively supervised by the state" and that "Oregon is therefore a 'complete control' state exempt from federal antitrust laws."

■ The dispositive issue, and the only one we need discuss, is the last. If there is insufficient state supervision, the case must be reversed as the state action exemption would not be available.

The leading case establishing the state action exemption from antitrust liability is *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) (*Parker*), which involved a challenge to California's Agricultural Prorate Act. The Prorate Act created a state commission authorized to establish marketing programs that restricted competition among growers in order to maintain prices in the distribution of their commodities. Upon petition of the growers for establishment of a prorate marketing plan, and after public hearings and investigation, the commission was authorized to grant the petition if it found that a marketing program would prevent agricultural waste and conserve the

---

comprising a sale, order or delivery. No allowance shall be made for return of containers and a wholesale licensee shall not purchase used containers from a retail licensee.

(b) The Commission may reject any price posting which is in violation of any of its rules. . . .

(c) Unless rejected by the Commission, prices shall be effective on the tenth day following receipt of the posting at the Portland office of the Commission. . . .

(d) All postings reflecting a price decrease, when accepted, shall remain in effect for 30 days after the effective date of the posting. The Commission, at its discretion, may waive the 30-day period to allow for price increases based upon conditions which in its opinion warrant the increases.

Oregon Administrative Rule 845-06-090 (1981) provides:

Transportation by licensed retailer from licensed wholesaler premises. A licensed retailer of malt beverages or of wine who is operating under a restaurant license, package store license, retail malt beverage license or dispenser license may transport, or have transported by the licensed retailer's employee or by a common carrier, from the licensed wholesaler premises to the licensed retailer

premises the malt beverages or wine sold to the licensed retailer by the licensed wholesaler. The purchase price of such malt beverages or wine shall be the price posted therefor, pursuant to section [845–10–210] hereof, for the trade zone at the licensed retailer premises.

2. On a petition for review of the validity of the rules, the Oregon Supreme Court held that the rules were within the rulemaking authority delegated to the commission and that they served the objectives of (1) eliminating price discrimination by wholesalers among retail outlets, (2) preventing vertical integration of liquor manufacturers, wholesalers, and retailers, and (3) preventing financial assistance by manufacturers to wholesalers or retailers to retailers. *Miller v. Oregon Liquor Control Comm'n,* 42 Or.App. 555, 600 P.2d 954 (1979). All of those practices are prohibited by Oregon law. Or. Rev.Stat. §§ 471.452, .455, .460, .465, and .470; Or.Const. art. I § 39(2). The court also observed that the commission does not have the power to establish beer and wine prices. *Miller v. Oregon Liquor Control Comm'n, supra,* 42 Or.App. at 560 n.3, 600 P.2d at 957 n.3.

agricultural wealth of the state. A program committee chosen from among individuals nominated by the producers was required to formulate a program. The commission was authorized to review the proposed program and to approve it if it was reasonably calculated to carry out the objectives of the Prorate Act. The Supreme Court held that California "in adopting and enforcing the prorate program . . . imposed [a restraint of trade] as an act of government which the Sherman Act did not undertake to prohibit." 317 U.S. at 352, 63 S.Ct. at 314. Explaining its decision, the Court stated:

> We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

*Id.* at 350–51, 63 S.Ct. at 313.

Here, we are primarily concerned with the state supervision requirement of the exemption. Its importance has been described by Professors Areeda and Turner in the following way:

> The existence of a state action immunity enables states, like the federal government itself, to define areas inappropriate for market control. Moreover, the adequate supervision criterion ensures that state-federal conflict will be avoided in those areas in which the state has demonstrated its commitment to a program through its exercise of regulatory oversight. At the same time, it guarantees that when the Sherman Act is set aside, private firms are not left to their own devices. Rather, immunity will be granted only when the state has substituted its own supervision for the economic constraints of the competitive market.

P. Areeda and D. Turner, I Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 213, at 73 (1978) (footnotes omitted).

We are aided in the application of this requirement by the Supreme Court's analysis in *Midcal, supra.* That case involved a challenge to a California law requiring all wine producers, wholesalers, and rectifiers to file fair trade contracts or price schedules with the state and prohibiting any state-licensed wine merchant from selling wine to a retailer at other than the price set in an effective price schedule or in an effective fair trade contract. The regulations provided that the wine prices posted by a single wholesaler within a trading area bound all wholesalers in that area. Any licensee selling below the established prices faced fines, license suspension, or outright license revocation. The state had no direct control over wine prices and it did not review the reasonableness of the prices set by the wine dealers. The Court held that the California plan for wine pricing violated the Sherman Act. In its decision, the Court clarified the two standards for antitrust immunity under *Parker*: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the state itself." 445 U.S. at 105, 100 S.Ct. at 943, *quoting City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.). *See Bates v. State Bar of Arizona*, 433 U.S. 350, 362, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977); *Turf Paradise, Inc. v. Arizona Downs*, 670 F.2d 813, 822–825 (1982). The Court reasoned that the California system for wine pricing satisfied the first standard because the legislative policy was forthrightly stated and clear in its purpose to permit resale price maintenance. The Court held, however, that the California system did not meet the second requirement for *Parker* immunity. The Court stated:

> The State simply authorizes price-setting and enforces the prices established by private parties. The State neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts.

The State does not monitor market conditions or engage in any "pointed reexamination" of the program. The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement. As *Parker* teaches, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful...." 317 U.S. at 351 [63 S.Ct. at 314].

*Midcal, supra,* 445 U.S. at 105–06, 100 S.Ct. at 943 (footnote omitted).

By way of dicta, the Court distinguished the California program from the approach of those states that "completely control the distribution of liquor within their boundaries." *Id.* at 106 n.9, 100 S.Ct. at 943 n.9. The Court reasoned, "Such comprehensive regulation would be immune from the Sherman Act under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), since the State would 'displace unfettered business freedom' with its own power." *Id., quoting New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 439 U.S. 96, 109, 99 S.Ct. 403, 412, 58 L.Ed.2d 361 (1978). The Court cited the liquor control laws in sections 4–15 and 4–28 of the Virginia Code as an example of state law completely controlling the distribution of liquor.[3] Pursuant to those statutes, Virginia authorized a state agency, the Alcohol Beverage Control Board, to fix the prices of alcoholic beverages sold in government stores carrying hard liquor and wines, and also authorized the Board to establish minimum retail prices for sale by private persons licensed to sell wine at retail for consumption off the premises.

The wholesalers and the commission argue that Oregon law, like Virginia law, completely controls the distribution of liquor within the state's boundaries and should therefore be immune from the Sherman Act under *Parker.* We disagree. The Oregon beer and wine pricing program resembles the California wine pricing program more closely than the liquor and wine pricing program of Virginia. Oregon "neither establishes prices nor reviews the reasonableness of the price schedules ... [nor does it] monitor market conditions or engage in any 'pointed reexamination' of the program." *Midcal, supra,* 445 U.S. at 105–06, 100 S.Ct. at 943. Oregon mandates the posting of prices to be charged by each wholesaler, but does not in any way review

**3.** The pertinent section of the Virginia Code includes the following provisions:

> The Board shall from time to time fix the prices at which the various classes, varieties and brands of alcoholic beverages shall be sold in [government] stores. Wholesale and retail prices shall be uniform throughout the State, except that the difference in cost of operating stores may be reflected in the sale price of alcoholic beverages sold at such stores, and the Board may sell alcoholic beverages to federal instrumentalities duly authorized and operating under the laws of the Congress and regulations of the United States Department of Defense and located within the boundaries of federal enclaves or reservations over which the United States has acquired jurisdiction, at such discount prices as the Board may determine, which discount prices may be greater or less than the wholesale price to other authorized purchasers.

Va.Code § 4–15(b) (1979).

> No alcoholic beverage having an alcoholic content of more than fourteen per centum by volume shall be sold at retail in the State of Virginia, except at government stores or ex-

cept by licensees under the provisions of chapter 1.1 (§ 4.98.1 et seq.) or as otherwise provided in this section of this title....

> Subject to the limitations set forth hereafter in this paragraph, port, sherry, tokay, muscatel and vermouth wines, and any other wine containing more than fourteen per centum but not more than twenty-one per centum of alcohol by volume approved by the Board for such purpose, may be sold by persons licensed under the provisions of this chapter to sell wine at retail for consumption off the premises. The Board, from time to time, may establish minimum retail prices for any wines offered for sale pursuant to this paragraph, which prices shall in no event be lower than those fixed for the same or similar wines offered for sale at the government stores. The Board likewise may specify by appropriate regulation the types of establishments at which such wines may be offered for sale in order that there may be an orderly distribution of such wines without adversely affecting the health, safety and welfare of the public and the purpose of this chapter.

Va.Code § 4–28 (1979).

the reasonableness of the prices set. While the commission "may reject any price posting which is in violation of any of its rules," Rule 210(1)(b), the effect of that rule is simply to effectuate the price posting and the prohibitions on quantity discounts and transportation allowances. It does not provide for government establishment or review of the prices themselves. The similarities between the Oregon and California laws and the differences between the Oregon and Virginia laws indicate that Oregon, like California, does not meet the second prong of the two-prong *Midcal* test. Oregon merely authorizes and enforces the disputed pricing practices. *See Midcal, supra,* 445 U.S. at 105, 100 S.Ct. at 943. It does not " 'displace unfettered business freedom' with its own power." *Id.* at 106 n.9, 100 S.Ct. at 943 n.9, *quoting New Motor Vehicle Bd. v. Orrin W. Fox Co., supra,* 439 U.S. at 109, 99 S.Ct. at 411–412. We need not pass upon whether the challenged restraint is "one clearly articulated and affirmatively expressed as state policy," because we conclude that the policy is not "actively supervised" by the state itself.

 We therefore reverse the judgment of the district court. We hold that Oregon's involvement in the beer and wine pricing system is not sufficient to establish antitrust immunity under *Parker.* We express no opinion as to whether the twenty-first amendment bars application of the Sherman Act in this case. The Supreme Court has observed that although the twenty-first amendment bestows on the states substantial discretion to establish liquor regulations, "those controls may be subject to the federal commerce power in appropriate situations. The competing state and federal interests can be reconciled only af-

ter careful scrutiny of those concerns in a 'concrete case.' " *Midcal, supra,* 445 U.S. at 110, 100 S.Ct. at 946. Neither do we express any opinion as to whether the actions of the commission, the wholesalers, or the association of wholesalers constitute antitrust violations. The pricing practices under the Oregon law differ significantly from the pricing practices under the California law in *Midcal.* We remand the case to the district court for further proceedings addressing these issues.[4]

REVERSED AND REMANDED.

---

4. The commission argues for the first time in its petition for rehearing that it is protected by the eleventh amendment. The district court had no occasion to reach this issue in its holding. Given the record before us, we follow the course of the Supreme Court in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), and "intimate no view on the issue, leaving it for the District Court on remand." *Id.* at 792 n.22, 95 S.Ct. at 2015 n.22. *See also Patsy v. Board of Regents,* —— U.S.

——, —— n.19, 102 S.Ct. 2557, 2568 n.19, 73 L.Ed.2d 172 (1982) (eleventh amendment is jurisdictional in nature and may be raised for the first time on appeal; however, state may waive the defense and it is not jurisdictional in the sense that it must be raised and decided by the court on its own motion). The eleventh amendment defense does not, of course, bar Miller's action in federal court against the private defendants in this case.