813 F.2d 1344
 1986-2 Trade Cases 67,336, 1987-1 Trade Cases 67,515
 Elsie Viola MILLER and Oretta Bernice Lancaster, doing
business as the Junction Cafe and Tavern; Taylor's Coffee
Shop, Inc., dba Rennie's Landing; Wian, Inc., dba Barney's
Cable, individually and as representatives of others
similarly situated, Plaintiffs-Appellants,
v.
William H. HEDLUND; Sylvia S. Bedingfield; Reuben A.
Worster; Stan Auderkirk and Jill Thorne, individually in
their representative capacities as the Commissioners of the
Oregon Liquor Control Commission; C. Dean Smith,
individually in his capacity as Administrator for the Oregon
Liquor Control Commission, Spear Beverage Co., Inc., and
Coast Distributors, Inc.; individually and as
representatives of others similarly situated, Defendants- Appellees.
 No. 84-3749.
 United States Court of Appeals,
Ninth Circuit.
 Argued July 10, 1985.
Decided Oct. 31, 1986.
Withdrawn Dec. 19, 1986.
Resubmitted Jan. 21, 1987.
Refiled April 6, 1987.
 
 1
 David W. Axelrod, Portland, Or., for plaintiffs-appellants.
 
 
 2
 Robert W. Muir, Salem, Or., for defendants-appellees.
 
 
 3
 Appeal from the United States District Court for the District of Oregon.
 
 
 4
 Before BROWNING, Chief Judge, ALARCON, Circuit Judge, and STEPHENS,* District Judge.
 
 ORDER
 
 5
 The opinion in this case was originally filed on October 31, 1986. On December 19, 1986, the opinion was withdrawn and the submission of this case was vacated pending resolution by the United States Supreme Court of 324 Liquor Corp. v. Duffy, No. 84-2022. 324 Liquor Corp. was decided on January 13, 1987 and is reported in --- U.S. ----, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987). This case was resubmitted on January 21, 1987.
 
 
 6
 324 Liquor Corp. confirms the reasoning and conclusions set forth in the opinion that was withdrawn. It is hereby ordered that the opinion filed on October 31, 1986 and withdrawn on December 19, 1986 be refiled with this order.
 
 STEPHENS, District Judge:
 BACKGROUND
 
 7
 This is an appeal from a summary judgment rejecting plaintiffs' antitrust challenge to certain Oregon regulations governing the sale and distribution of beer and wine. The district court's judgment is reversed and remanded for further proceedings in accordance with this opinion.
 
 
 8
 The Oregon Liquor Control Act was enacted in 1933. It established a distribution structure for alcoholic beverages among manufacturers, wholesalers and retailers in Oregon. See O.R.S. sections 471.205, et seq. It also established a six-member Oregon Liquor Control Commission (OLCC) to administer its provisions. See O.R.S. section 471.705. The Oregon Liquor Control Act gave the OLCC extensive power to promulgate rules and regulations to carry out the purposes of the Act. O.R.S. sections 471.040, 471.730, 471.045; Van Ripper v. Oregon Liquor Control Commission, 228 Or. 581, 591, 365 P.2d 109 (1961). Oregon Revised Statutes sections 471.210, et seq. set forth requirements for the licensing of wholesalers of beer and wine. Other provisions in the Oregon Revised Statutes prohibit a licensee's selling at both the wholesale and retail levels (O.R.S. section 471.452); restrict a wholesaler or manufacturer from having an interest in a retailer (O.R.S. section 471.455); and prevent a manufacturer or wholesaler from providing any financial assistance to any retailer (O.R.S. section 471.465).
 
 
 9
 In 1978, Miller, Lancaster and other tavern owners in Oregon (the retailers) sued the OLCC and several wholesalers of beer and wine, contending that certain regulations promulgated by the OLCC, specifically Oregon Administration Rules section 845-10-210 and 845-06-090 (1980)[1] have the effect of stabilizing and maintaining the prices of beer and wine in Oregon in violation of the Sherman Act, 15 U.S.C. section 1, et seq.[2] The plaintiffs objected to the following four features of the rules: the prohibition of quantity discounts; the requirement that licensees post prices ten days prior to their effective dates; the requirement that price decreases generally remain effective after posting for a period of 180 days for malt beverages and 30 days for wine; and the requirement that the posted price be the delivered price regardless of transportation costs. The retailers sought declaratory and injunctive relief restraining the OLCC from enforcing the regulations.
 
 
 10
 In 1979, the district court stayed proceedings to allow the Oregon courts to review the validity of the challenged regulations with respect to the OLCC's enabling legislation. The Oregon Court of Appeals held that the regulations were valid and reasonably designed to further statutory purposes. Miller v. Oregon Liquor Control Commission, 42 Or.App. 555, 600 P.2d 954 (1979) (Miller I ).
 
 
 11
 In 1980, the district court granted defendants' motion to dismiss the retailers' federal suit on the ground that Oregon's involvement in the regulation and control of the liquor industry was sufficient to establish immunity from federal antitrust law under the state action exemption first articulated by the Supreme Court in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). On appeal, this court reversed the district court's dismissal, holding that Oregon's regulatory policy is not "actively supervised" by the state itself, which supervision the court considered necessary in order to invoke Parker immunity. Miller v. Oregon Liquor Control Commission, 688 F.2d 1222, 1227 (9th Cir.1982) (Miller II ). No opinion was expressed regarding the existence of an antitrust violation or the Twenty-first Amendment.
 
 
 12
 On remand, the plaintiffs moved for summary judgment. The defendants filed a cross-motion for summary judgment on the grounds that they had not engaged in a combination, conspiracy, or agreement in restraint of trade and that the regulations do not authorize or require any concerted activity. Defendants further argued that Oregon's enforcement of the regulations should be accorded state action immunity under Parker v. Brown, or be held valid under the Twenty-first Amendment to the United States Constitution.
 
 
 13
 The district court denied plaintiffs' motion, and granted the defendants' motion, holding that the regulation requiring wholesalers to publicly post their prices and adhere to those prices for certain periods of time do not conflict with federal antitrust policy since they only require "unilateral" action by individual wholesalers, rather than the concerted action necessary for a violation of the Sherman Act, 579 F.Supp. 116. The court determined that the regulations requiring the posted price to be the delivered price and forbidding quantity discounts conflicted with the Sherman Act, but nonetheless upheld them on the basis of Parker immunity, relying on certain intervening changes in Oregon law. The court's decision did not include a discussion of the applicability of the Twenty-first Amendment. The court also held in favor of the wholesalers, because of the absence of any concerted activity on their part.
 
 
 14
 The plaintiff retailers appealed the district court's order granting summary judgment to defendants. They contended that the posting and post-off provisions and the delivered price rule[3] conflict with the Sherman Act because of the conduct they require, and that it is not necessary that a separate agreement in restraint of trade be formed in order to find a violation of the Sherman Act. The retailers further claim that the challenged regulations are not exempt from the Sherman Act under Parker v. Brown because the state does not actively supervise the prices set by the wholesalers and because the state has not articulated a policy to displace competition in the wholesale distribution of beer and wine. Finally, they argue that the Twenty-first Amendment does not save the regulations from a Sherman Act challenge.
 
 
 15
 The issues which must be decided are (1) whether the regulations effect a per se violation of the Sherman Act; (2) if they do, whether they fall within the Parker exemption; (3) and whether the Twenty-first Amendment saves the regulation from the antitrust challenge.
 
 STANDARD OF REVIEW
 
 16
 This court reviews a grant of summary judgment de novo "to determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986).
 
 ANTITRUST ISSUE
 
 17
 The analytical framework that structures the approach to the antitrust issue is set forth in Rice v. Norman Williams Co., 458 U.S. 654, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982).
 
 
 18
 In determining whether the Sherman Act preempts a state statute, we apply principles similar to those which we employ in considering whether any state statute is pre-empted by a federal statute pursuant to the Supremacy Clause. As in the typical preemption case, the inquiry is whether there exists an irreconcilable conflict between the federal and state regulatory schemes. The existence of a hypothetical or potential conflict is insufficient to warrant the preemption of the state statute. A state regulatory scheme is not pre-empted by the federal antitrust laws simply because in a hypothetical situation a private party's compliance with the statute might cause him to violate the antitrust laws. A state statute is not pre-empted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect.
 
 
 19
 A party may successfully enjoin the enforcement of a state statute only if the statute on its face irreconcilably conflicts with federal antitrust policy.
 
 
 20
 Id. at 659, 102 S.Ct. at 3298 (citations omitted). The court went on to add the following:
 
 
 21
 [A] state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute. Such condemnation will follow under section 1 of the Sherman Act when the conduct contemplated by the statute is in all cases a per se violation.
 
 
 22
 Id. at 661, 102 S.Ct. at 3300.
 
 
 23
 The general issue here is therefore whether the Oregon regulations effect a per se violation of the Sherman Act. "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pacific R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Such agreements or practices are deemed unlawful per se and require no further factual inquiry under the "rule of reason" generally applied in Sherman Act cases. See Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979).
 
 
 24
 An agreement to adhere to previously announced prices and terms of sale is unlawful per se under the Sherman Act, "even though advance price announcements are perfectly lawful and even though the particular prices and terms were not themselves fixed by private agreement." Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 647, 100 S.Ct. 1925, 1928, 64 L.Ed.2d 580 (1980) (per curiam ), discussing Sugar Institute v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936). It is no defense that the prices fixed are themselves reasonable. Id.; see also Northern California Pharmaceutical Assoc. v. United States, 306 F.2d 379, 385 (9th Cir.1962) ("there is no defense to price-fixing on the ground that it is reasonable"), cert. denied, 371 U.S. 862, 83 S.Ct. 119, 9 L.Ed.2d 99 (1962).
 
 
 25
 Section 1 of the Sherman Act is directed at prohibiting unreasonable restraints of trade effected by a contract, combination, or conspiracy among separate entities. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984). It is therefore necessary to distinguish the independent activity of a single entity from a concerted effort by more than one entity to fix prices or otherwise restrain trade. See Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984).
 
 
 26
 If the wholesale beer and wine distributors had entered into a private agreement to accomplish what is otherwise required by the Oregon regulations, there is no question that a per se violation of Section 1 of the Sherman Act would be found. The appellees point out, however, that the wholesalers merely act unilaterally in response to the requirements of the regulations and that there is no agreement or concerted activity of any sort among them. They conclude that this absence of any concerted activity precludes the existence of any Sherman Act violation.
 
 
 27
 The appellees' treatment of this difficult issue oversimplifies it. While it is true that there is no agreement or concerted activity among the wholesalers, it can not be ignored that the challenged regulations facilitate the exchange of price information and require adherence to the publicly posted prices. In other words, the state compels activity that would otherwise be a per se violation of the Sherman Act. It is the presence of state compulsion that requires a more refined analysis than the one presented by the appellees. Simply ending the analysis because of the lack of concerted activity among the wholesalers fails to take into account the presence and effect of the state's involvement in the matter.
 
 
 28
 The Supreme Court recently addressed the unilateral versus concerted activity issue in a case involving an antitrust challenge to a municipality's regulation. In Fisher v. City of Berkeley, 475 U.S. 260, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986), the City enacted a rent control ordinance imposing strict rent ceilings on rental property. A group of landlords challenged the ordinance. The issue before the Court was whether the ordinance was pre-empted by federal antitrust laws. The landlords argued that the rent controls were a form of horizontal price-fixing and therefore were a per se violation of the Sherman Act. The Court rejected this argument and upheld the validity of the ordinance. The opinion discussed the critical distinction between unilateral and concerted action and held that there was no violation of the Sherman Act because of the absence of any concerted activity. "A restraint imposed unilaterally by government does not become concerted action within the meaning of the statute simply because it has a coercive effect upon parties who must obey the law." Id., 106 S.Ct. at 1049-1050.
 
 
 29
 The following language from this opinion is crucial to the issue in this case.
 
 
 30
 Not all restraints imposed upon private actors by government units necessarily constitute unilateral action outside the purview of section 1. Certain restraints may be characterized as 'hybrid,' in that nonmarket mechanisms merely enforce private marketing decisions. See Rice v. Norman Williams Co., 458 U.S. , at 665 [102 S.Ct. 3294, 3302, 73 L.Ed.2d 1042 (1982) ], ... (STEVENS, J., concurring in the judgment). Where private actors are thus granted "a degree of private regulatory power," id., at 666, n. 1 [102 S.Ct., at 3302, n. 1] ..., the regulatory scheme may be attacked under section 1. Indeed, this Court has twice found such hybrid restraints to violate the Sherman Act. See Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384 [71 S.Ct. 745, 95 L.Ed. 1035 (1951); California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc., 445 U.S. 97 [100 S.Ct. 937, 63 L.Ed.2d 233] (1980) ...
 
 
 31
 Id. at 1050.
 
 
 32
 As explained in Justice Stevens' concurring opinion in Norman Williams, there are three types of restraints on competition--purely private, purely public, and hybrid. The purely private restraint is clearly not involved in this case because of the state's regulations. The issue therefore narrows itself to whether the Oregon regulations are a hybrid restraint or a purely public restraint. The resolution of this issue determines whether the regulations violate the Sherman Act.
 
 
 33
 An examination of Schwegmann and Midcal adds light to this issue. In Schwegmann, the liquor retailer petitioner had refused to agree to a retail price maintenance provision with two liquor distributors. The distributors sought to enjoin the retailer from selling their products at less than the minimum prices fixed in their contracts with other retailers. At that time, a Louisiana statute permitted product distributors to enforce retail price maintenance provisions against contracting retailers and non-contracting retailers. Thus, if a distributor and single retailer entered into a contract fixing retail prices, all retailers were prohibited from selling below the price set by the contracting distributor and retailer. After finding that the statute went beyond the now-repealed Miller-Tydings Act, the Court held that the two liquor distributors had violated Section 1 of the Sherman Act when they attempted to hold the retailer to the prices fixed in other contracts.
 
 
 34
 In its discussion of Schwegmann, the Court in Berkeley stated:
 
 
 35
 [U]nder the Louisiana statute, both the selection of minimum price levels and the exclusive power to enforce those levels were left to the discretion of distributors. While the petitioner-retailer in that case may have been legally required to adhere to the levels so selected, the involvement of his suppliers in setting those prices make it impossible to characterize the regulation as unilateral action by the State of Louisiana.
 
 
 36
 Berkeley, 106 S.Ct. at 1050.
 
 
 37
 In Midcal, California required all wine producers, wholesalers, and rectifiers to file fair trade contracts or price schedules with the state. If a wine producer did not set prices, wholesalers were required to post a price schedule for that product's brands. A wine merchant could sell wine only at those prices to a retailer. The Court held that this pricing system constituted resale price maintenance in violation of the Sherman Act. As in Schwegmann, the mere existence of legal compulsion did not transform a pricing scheme into unilateral action by the state. The state had no direct control over the prices set by the private parties, and it did not review the reasonableness of those prices.
 
 
 38
 A comparison of Schwegmann and Midcal with this case leads to the conclusion that the Oregon regulations constitute a "hybrid" restraint in violation of the Sherman Act.[4] The argument that the regulations merely involve unilateral action must be rejected on two grounds. First, Schwegmann demonstrates that a showing of concerted activity among the Oregon wholesalers is not necessary to establish an antitrust violation. The mere fact that each wholesaler complies unilaterally with the regulations does not save an impermissible pricing scheme from an antitrust challenge. In Schwegmann, non-contracting retailers were compelled to comply unilaterally with a state-authorized pricing scheme, but the absence of concerted activity among the retailers was not a bar to a finding of a Sherman Act violation. Second, Schwegmann and Midcal show that Oregon's actions are not unilateral. The regulations constitute a "hybrid" restraint because, as in those two cases, Oregon allows private parties to set the prices and does not review the reasonableness of those prices. It follows that this case is unlike the purely public restraint of Berkeley's regulatory scheme which removed the power to set rents from the landlords.
 
 PARKER V. BROWN ISSUE
 
 39
 Having concluded that the Oregon regulations violate Section 1 of the Sherman Act, a decision must be made as to whether Oregon's involvement in the regulatory scheme is sufficient to establish antitrust immunity under Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In Parker, the Supreme Court held that the federal antitrust laws do not prohibit a state from imposing anticompetitive restraints on the marketplace. "The circumstances in which Parker immunity is available ... to state agencies or officials regulating the conduct of private parties [is] defined most specifically by [the] decision in California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc., supra, 445 U.S., at 97 [100 S.Ct., at 937] ..." Southern Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 105 S.Ct. 1721, 1727, 85 L.Ed.2d 36 (1985).[5] Under the test set forth in Midcal, the state agency must meet two standards in order to establish antitrust immunity. First, the challenged restraint must be " 'clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." Midcal, 445 U.S., at 105, 100 S.Ct., at 943 (citing City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978)); see also Llewellyn v. Crothers, 765 F.2d 769, 773 (9th Cir.1985) (applying two-part Midcal test to de facto fee schedule established by Oregon agency).
 
 
 40
 In Miller II this court applied the Midcal test and held that the Oregon regulations do not fall within the Parker exemption because the state does not actively supervise the restraint. Regardless of whether or not we are bound by this prior ruling under the "law of the case" doctrine, there is no reason to depart from that holding. As stated in Miller II:
 
 
 41
 Oregon "neither establishes prices nor reviews the reasonableness of the price schedules ... [nor does it] monitor market conditions or engage in any 'pointed reexamination' of the program." Midcal, supra, 445 U.S. at 105-06 [100 S.Ct. at 943-44],.... Oregon mandates the posting of prices to be charged by each wholesaler, but does not in any way review the reasonableness of the prices set. While the commission "may reject any price posting which is in violation of any of its rules," Rule 210(1)(b), the effect of that rule is simply to effectuate the price posting and the prohibitions on quantity discounts and transportation allowances. It does not provide for government establishment or review of the prices themselves.... Oregon merely authorizes and enforces the disputed pricing practices. See Midcal, supra, 445 U.S. at 105 [100 S.Ct. at 943],....
 
 
 42
 Miller II, 688 F.2d at 1226-27.
 
 
 43
 There have been no material changes in Oregon's regulatory scheme since Miller II, and we likewise conclude that Oregon has failed to satisfy the second part of the two part Midcal test.[6] Because the failure to show active supervision, by itself, removes the Parker exemption, there is no need to decide whether the state meets the first part of the test.
 
 TWENTY-FIRST AMENDMENT ISSUE
 
 44
 Since the Parker exemption does not apply, it is necessary to turn to the final and dispositive issue of whether the Twenty-first Amendment shields the challenged regulations. The Supreme Court has stated the issue as " 'whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies.' " Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 275-76, 104 S.Ct. 3049, 3057-58, 82 L.Ed.2d 200 (1984) (quoting Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 714, 104 S.Ct. 2694, 2708, 81 L.Ed.2d 580 (1984)).
 
 
 45
 In order to resolve this issue, it is necessary to consider and compare the conflicting federal and state interests. Brown-Forman Distillers Corp. v. New York State Liquor Authority, --- U.S. ----, 106 S.Ct. 2080, 2087, 90 L.Ed.2d 552 (1986); see Stein Distribution Co. v. Department of the Treasury Bureau of Alcohol, Tobacco & Firearms, 779 F.2d 1407, 1410 (9th Cir.1986). As the court said in California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97, 110, 100 S.Ct. 937, 946, 63 L.Ed.2d 233 (1980), "there is no bright line between federal and state powers over liquor.... The competing state and federal interests can be reconciled only after careful scrutiny of those concerns in a 'concrete case.' "
 
 
 46
 The federal interest embodied in the Sherman Act is well-recognized and substantial. The Sherman Act has been described as "the Magna Carta of free enterprise," United States v. Topco Associates, Inc., 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972), and Congress " 'exercis[ed] all the power it possessed' under the Commerce Clause when it approved the Sherman Act," Midcal, 445 U.S. at 111, 100 S.Ct. at 946 (citations omitted). As we have noted, the Oregon regulations involved in this case compel activity that would constitute a per se violation of the Sherman Act.
 
 
 47
 Against this substantial impairment of the strong federal interest in favor of competition must be weighed the state's interest the challenged regulations serve.[7] The parties disagree as to the extent to which these regulations advance the interests Oregon avows and the closeness of these avowed interests to those the Twenty-first Amendment protects.
 
 
 48
 The district court did not reach this issue because it decided the case upon another ground. Since we have rejected the ground upon which the lower court's decision rested and since the Twenty-first Amendment issue may ultimately rest upon findings and conclusions having a large factual component, we remand this issue for the trial court's initial determination.
 
 
 49
 REVERSED AND REMANDED.
 
 
 
 *
 Honorable Albert Lee Stephens, Jr., Chief Judge Emeritus, Central District of California, sitting by designation
 
 
 [1]
 The challenged regulations read as follows:
 Oregon Administrative Rule 845-10-210:
 Price Posting.
 (1) Posting of malt beverage prices:
 (a) Licensees of the Commission engaged in the business of soliciting the sale of, selling or distributing malt beverages for resale within the State of Oregon shall file with the Commission at its Portland office a written schedule in three copies of prices to be charged for all such beverages offered for sale within the state. The prices shall be uniform for the same class trade buyers and shall set forth:
 (A) All brands and types of products offered for sale,
 (B) The delivered sale price for each size container to retail licensees,
 (C) Prices or maximum allowances or discounts to wholesale licensees, and
 (D) Any allowance granted for return containers.
 All price postings shall be consistent as between the various packages and containers offered for sale. No price postings involving quantity discounts shall be made.
 (b) The Commission may reject any price posting which is in violation of any of its rules....
 (c) Unless rejected by the Commission, prices shall be effective on the tenth day following receipt of the posting at the Portland office of the Commission....
 (d) All postings reflecting a price decrease, when accepted, shall remain in effect for 180 days after the effective date of the posting. The Commission, at its discretion, may waive the 180-day period to allow for price increases based upon conditions which in its opinion warrant the increases.
 (2) Posting of wine prices:
 (a) Licensees of the Commission engaged in the business of soliciting sales of, selling or distributing wine for resale within the State of Oregon shall file with the Commission at its Portland office a written schedule in two copies of prices to be charged by such licensee for all wine offered for sale within the state. The prices shall be uniform for the same class of trade buyers and shall set forth:
 (A) All brands, classes and kinds of wine offered for sale, and
 (B) The delivered sale price of each size container to retail licensees.
 Prices shall be the same for one container as for each like container in any quantity comprising a sale, order or delivery. No allowance shall be made for return of containers and a wholesale licensee shall not purchase used containers from a retail licensee.
 (b) The Commission may reject any price posting which is in violation of any of its rules....
 (c) Unless rejected by the Commission, prices shall be effective on the tenth day following receipt of the posting at the Portland office of the Commission....
 (d) All postings reflecting a price decrease, when accepted, shall remain in effect for 30 days after the effective date of the posting. The Commission, at its discretion, may waive the 30-day period to allow for price increases based upon conditions which in its opinion warrant the increases.
 Oregon Administrative Rule 845-06-090:
 Transportation by licensed retailer from licensed wholesaler premises. A licensed retailer of malt beverages or of wine who is operating under a restaurant license, package store license, retail malt beverage license or dispenser license may transport, or have transported by the licensed retailer's employee or by a common carrier, from the licensed wholesaler premises to the licensed retailer by the licensed wholesaler. The purchase price of such malt beverages or wine shall be the price posted therefor, pursuant to section [845-10-210] hereof, for the trade zone at the licensed retailer premises.
 
 
 [2]
 Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among several States, or with foreign nations, is declared to be illegal...."
 
 
 [3]
 The quantity discount rule is not challenged on appeal
 
 
 [4]
 However, we affirm the district court's holding in favor of the wholesalers. Although the wholesalers are participants in a regulatory scheme effecting an antitrust violation, there is no evidence of concerted action on their part. "[T]here can be no liability under [sec.] 1 in the absence of an agreement." Berkeley, 106 S.Ct. at 1049
 
 
 [5]
 Southern Motor Carriers rebuts the state's assertion that under Hoover v. Ronwin, 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984), it need not show "clear articulation" or "active supervision". In Hoover, the Court stated: "Where the conduct at issue is in fact that of the state legislature or supreme court, we need not address the issues of 'clear articulation' and 'active supervision.' " Id. at 569, 104 S.Ct. at 1995
 
 
 [6]
 Oregon states that each agency is required by law to review the impact of its rules and that Oregon's "sunset review law" reviews the necessity of the existence of an agency. It argues that these measures constitute active supervision. This argument is without merit because neither means of review sets the actual prices or determines the reasonableness of those prices
 
 
 [7]
 Defendants argue the Oregon Court of Appeals' decision in Miller v. Oregon Liquor Control Commission, 42 Or.App. 555, 600 P.2d 954 (1979), determines the extent to which the challenged regulations serve interests under the Twenty-first Amendment. The state court's decision, however, determined only that the regulations were reasonably related to state statutory purposes, and therefore that there was a valid exercise of the administrative agency's authority. The issues under the Twenty-first Amendment are quite different. The court must examine both the federal interest and the state interest and resolve the conflict between them in accordance with what is at stake for each in reality in the concrete case--the court must examine the purpose of the federal rule and the extent to which the state rule frustrates that purpose; the avowed purposes of the state rule and their closeness to the interests the Twenty-first Amendment serve; and the extent to which, in reality, the state rule serves its avowed purposes. California Liquor Dealers v. Midcal Aluminum, 445 U.S. 97, 108-14, 100 S.Ct. 937, 944-48, 63 L.Ed.2d 233 (1980)